Anne Monroe  
vs.   No. 79713  
Paul Lavimodiere

January 7, 1931

POULIOT, J. This is an action brought by Anne Monroe to recover from Paul Lavimodiere damages for an alleged breach of promise to marry, and is before the Court on defendant's motion for a new trial on the usual grounds, after a jury verdict for the plaintiff in the sum of $23,000.

The plaintiff's story is that some 22 years prior to the time of the alleged promise to marry she and the defendant lived in tenements which were across from each other in the building owned by the defendant; that the defendant did not know English and that she taught him to speak it; that he then married his first wife and plaintiff was so angry on learning of his marriage that she didn't speak to him for three years; that they then resumed their friendship and at one time the plaintiff took care of the defendant's home while he was in Canada with his family. Plaintiff and defendant both attended the same church and it sometimes happened that on coming out of church defendant took her for an automobile ride along with his family. At another time the defendant loaned the plaintiff $200 for a sister in Utica, which sum was repaid. Again, defendant offered to set up plaintiff or plaintiff's sister in business. Defendant's children called at plaintiff's home and plaintiff was friendly with defendant's wife.

Thus, up to the time of the death of defendant's wife, we have a picture of amicable relations existing between the parties and existing over a period of more than 20 years. Defendant's wife died on October 1, 1925, and plaintiff and defendant met on the street some five or six weeks later, approximately around the 1st or 2nd of December. She said that on that occasion, although he was a grieved man and all broken up, he told her he wanted to give his children a second mother; that when he made that statement, she took it for granted that the defendant then meant her. She further said that the next time she saw him was about three weeks later, when he rang her doorbell and she would not admit him to her home, but stood out in the hallway talking for three-

quarters of an hour. She told of other visits which she claimed defendant made to her, some eight or nine over a period of four months, on one of which occasions the defendant met her brother in the kitchen, and that on all these occasions the defendant talked marriage. She testified she took two or three auto rides with him and received postal cards from him while he was away. Although she received no gifts from him, she said he gave her $10 to buy herself a present on Christmas, 1925. She wrote him several letters in which she stated in substance that she was engaged to marry him.

The defendant strongly denies any promise to marry as well as any language which could be construed as meaning he had any such intention. He denied giving her $10 as a Christmas present. He states that with one exception the only times she was out riding in his auto were when he took her with his family, and that the only time he took her out alone was when he called next door to her home to take a sick employee his weekly pay. On that occasion he had a new Buick car that the plaintiff noticed and he gave her a ride in it at her request. He claims that there were only two occasions when he called at her home; once when he went in to get an umbrella and the other when she called him in to see the new metal ceiling which her landlord had installed. The postal cards which he sent to her, he said, had no special significance as it was his custom to send some to all his friends when he was away from Woonsocket.

The plaintiff and the defendant are the only two persons who gave any testimony on the issue in this case and it may help us to consider their personalities. The plaintiff is a well preserved woman, fifty-five years old, of a determined, aggressive character. She has a good command of the English language, is quick witted, bright and energetic. She is employed in a mill, has had a fairly hard time of life and has had few of its luxuries. She is shrewd in her answers and while she is inclined to get angry, yet keeps her temper admirably under control. The defendant is almost the opposite. He is a slow thinker, has difficulty in expressing himself in English, and his conduct on the stand was such that at times he was amusing, on occasion, ridiculous, and one wondered how a man of his type could have achieved the success that is his.

In a case of this kind it seems to the Court the test to be applied is: Was the conduct of the parties such as is usual between persons who are engaged to marry? The first thing that strikes us about the plaintiff's case is the claim that, within a very short time after his wife's death, the defendant, while still a broken and grieved man, met the plaintiff on the street and then and there promised marriage to her. That, of course, is unusual in the case of a man who has lived a happy life with a good, devoted wife, such as was the deceased wife. That this proposal was not clearly in the minds of the parties is evident by the testimony of the plaintiff, who relates the conversation she had with the defendant about his giving his children a second mother, and that she assumed she was the one meant. The next incident was the call plaintiff said defendant made at her home on Saturday night, when she would not let him enter the house but talked with him for three-quarters of an hour out in the corridor, and she goes on and narrates what purports to be various other visits, in all of which she says he talked marriage but she kept putting him off because she wanted him to wait until a year had elapsed from the time of his wife's death before marrying him and she didn't want him to call during that period because people might talk. Is it the usual conduct of an engaged couple to care what the neighbors may

say or think of an honorable courtship? It shouldn't have been in this case, for not a single person was produced who ever saw the plaintiff and defendant together. The Collins people, who lived in the same house as the plaintiff, never saw the defendant there, and the plaintiff's brother, who worked in Woonsocket at the time of the trial and who was available, was not brought in to corroborate plaintiff's claim that he had met the defendant on one occasion at the plaintiff's home. Are the postal cards in the exhibits indicative of more than the ordinary attention of one friend to another? A careful examination of their contents fails to reveal any especial meaning and they appear to be nothing but the ordinary courtesy one extends to acquaintances and friends back home when one is away on a vacation. An analysis of the entire testimony might be made in the same way and outside of the plaintiff's statement that defendant promised to marry her, which is denied by him, we find, in the entire case, only such attentions and courtesies as ordinarily pass between good friends.

Then how explain the jury finding for the plaintiff! The reason for such a decision having been reached lies in the argument of the plaintiff's counsel to the jury. In our experience as a practicing attorney and as a justice of this court, we have never heard a more impassioned argument to the jury, nor a more bitter denunciation of a defendant. The defendant is the type of man who gives to a clever attorney a wonderful opportunity to evoke prejudice against him and sympathy for the party opposed to him, and counsel for the plaintiff in this case most ably took advantage of this opportunity and stirred in the jury emotions of sympathy on the one hand and prejudice on the other, which are reflected in the size of the verdict—$23,000.

The defendant was made to appear in argument as practically a millionaire, but when we analyze the valuation of his holdings and the mortgages which were taken to attempt to protect the accounts which are already included in the book valuations of his business, and which, it appears, have become worthless, the defendant's financial standing takes a considerable drop.

In passing upon this case the Court does not give as great consideration to the words uttered by these two parties as to the manner in which they were spoken, and to the atmosphere which appeared to surround the case. The impression which has continued to remain with the Court since this trial is one of grave doubt as to the probability of the incidents related by the plaintiff having the significance which she attaches to them. This Court can not conscientiously give its approval to a verdict which it believes is based not upon the weight of the evidence but upon passion, sympathy or prejudice.

Therefore, defendant's motion for a new trial is granted.

For plaintiff: John R. Higgins.

For defendant: R. L. Daignault, Archambault & Lambert.